UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE


R.N. b/n/f of P.N.
and R.N. individually

    v.                              Civil No. 15-cv-420-JD
                                    Opinion 2016 DNH 044
Geoffrey Rogan


O R D E R


    R.N. brings suit on behalf of his son, P.N., and himself,
alleging federal and state claims that arose from an incident in
Merrimack, New Hampshire, in October of 2014.  During the
incident, New Hampshire State Trooper, Geoffrey Rogan, while off
duty, intervened to stop P.N., who was wearing a costume, from
interacting with cars near a day care center.  Rogan moves for
summary judgment, and R.N. objects.


Standard of Review

    Summary judgment is appropriate when the moving party
"shows that there is no genuine dispute as to any material fact
and the movant is entitled to judgment as a matter of law."
Fed. R. Civ. P. 56(a).  "A genuine dispute is one that a
reasonable fact-finder could resolve in favor of either party
and a material fact is one that could affect the outcome of the
case."  Flood v. Bank of Am. Corp., 780 F.3d 1, 7 (1st Cir.

2015).  Reasonable inferences are taken in the light most
favorable to the nonmoving party, but unsupported speculation
and evidence that "is less than significantly probative" are not
sufficient to avoid summary judgment.  Planadeball v. Wyndham
Vacation Resorts, Inc., 793 F.3d 169, 174 (1st Cir. 2015)
(internal quotation marks omitted).

## Background

In early October of 2014, P.N. and his father, R.N. drove
to Merrimack, New Hampshire, to purchase a Halloween costume for
P.N.  P.N. chose a rubber pig head mask that covered his head
down to his shoulders.  On the back, the pig head mask was
colored blood red to suggest a severed pig's head.  P.N. also
chose werewolf gloves that extended up his arms.

P.N. was twelve years old in October of 2014.  He was five
feet eight inches tall, without the pig head mask on his head.
The mask added several inches to his height.

After buying the costume, P.N. and R.N. drove to a
McDonald's on the corner of Route 101A and Continental Boulevard
in Merrimack.  P.N. was wearing his pig head mask and werewolf
gloves.  When they parked, R.N. received a message on his cell
phone, so he stayed in the car to deal with the message.  R.N.
gave P.N. permission to get out of the car, although R.N. and
P.N. remember differently whether R.N. said that P.N. could

leave the parking lot and cross the street.  P.N. went into the McDonald's and waved to people and pointed, wearing his pig head mask and werewolf gloves.

P.N. left McDonald's through a side door and crossed Continental Boulevard to stand near a day care center.  P.N. chose that spot to draw more attention to himself because of the number of cars turning into the day care center.  While standing at the day care center, P.N. waived and pointed at cars, made a throating slitting gesture, and ran after at least one of the cars on the street.

Rogan and his wife drove to the day care center to pick up their daughter in their SUV.  Rogan was not on duty, was not wearing his uniform, and did not have a jacket or other distinctive clothing to show that he was a state trooper. Rogan's wife, Vanessa, was driving the SUV.  While they waited at the traffic light at the intersection of Route 101A and Continental Boulevard, Rogan saw someone in a costume running at cars near the intersection, heard cars beeping at him, and saw cars swerving around him.

When Vanessa got the green light, she turned left into the day care center.  As she turned, P.N. jumped in front of her car, causing her to slam on the brakes.  P.N. began to jump around while pointing and waving at Vanessa.  As Vanessa drove

around P.N., he came to her window, but Vanessa drove away from him.  After they were parked, P.N. pointed at them and began to walk or jog toward the car.

Rogan told Vanessa to call the police and got out of the car.  With the mask, P.N. appeared to be about six feet tall. Because of his odd and harassing behavior, Rogan thought P.N. was a teen ager or a young adult either under the influence of drugs or alcohol or experiencing a mental health episode.  Rogan also thought P.N. might be intending to commit a crime while his identity was concealed with the mask.

When Rogan began to get out of the car, P.N. quickly changed direction and ran away, still wearing his mask and gloves.  Rogan remembers that he yelled "Stop, State Police," but P.N. did not stop or slow down.[1]  P.N. remembers that Rogan yelled "Hey you, kid, get over here."  P.N. remembers being afraid of Rogan and that he intended to run across the street and back to McDonald's where his father had parked.  As P.N. neared Continental Boulevard and was about to run across, despite the traffic, Rogan caught him and brought him to the ground.  P.N. sustained scrapes on his arm, knee, and lower back during the fall.

---

[1] Neither P.N. nor Vanessa heard Rogan yell "Stop, State Police."

Rogan remembers that P.N. was flopping around on the ground with the mask twisted on his face and that Rogan identified himself as a state trooper.  P.N. remembers that Rogan said, "in essence, 'What the [expletive] do you think you're doing here?'" Rogan put P.N.'s arm behind his back and searched him for weapons.  Rogan did not know that P.N. was a child until he removed the mask.  He then asked P.N. what he was doing and where his parents were.

R.N. arrived in his car and asked Rogan if there was a problem.  Rogan showed R.N. his state trooper identification and asked R.N. to sit down next to P.N.  R.N. remembers that Rogan then said, "Yeah, there's a [expletive] problem," paced around talking about "crazy shit that's going on in the world," and told them that his daughter went to that day care center.  R.N. thought that Rogan was acting as if he were intoxicated.  After reporting the incident to his supervisor, Rogan told R.N. and P.N. that they could go but that R.N. could be charged with contributing to the delinquency of a minor.[2]

---

[2] R.N. also remembers that Rogan yelled at a woman, Vanessa, to get back into the day care center and yelled at P.N. to take off the werewolf gloves.  Rogan denies that he was swearing and remembers that P.N. said he was sorry for his behavior and that R.N. was apologetic about his son's behavior.

When they got back to the car, R.N. took a photo of an abrasion on P.N.'s elbow.  They then drove to the Nashua police station and talked with an officer there who told them that the incident occurred in Merrimack.  They drove to the Merrimack police station.  A police officer there saw that P.N. had a minor abrasion on his elbow with dried blood.  R.N. and his wife filed a report of the incident with the Merrimack police.

P.N. wore the pig head mask and werewolf gloves as his Halloween costume several weeks later.  He did not require any further treatment for injuries and did not have any permanent physical injury.

## Discussion

R.N. on his own behalf and on behalf of P.N. brings a claim under 42 U.S.C. § 1983 that Rogan violated their civil rights by detaining them and by tackling P.N., which they contend was excessive force.  R.N. also brings state claims of assault, battery, intentional and negligent infliction of emotional distress, and false arrest.  Rogan moves for summary judgment on the federal claims on the grounds that he properly detained R.N. and P.N., that his use of force was justified under the circumstances, that P.N. has not sustained any injury that would support a federal claim, and that he is entitled to qualified

immunity.[3]  Rogan moves for summary judgment on the state claims based on immunity defenses.

A.  Civil Rights Claims

    "To make out a Fourth Amendment excessive force claim, a plaintiff must show, as an initial matter, that there was a seizure within the meaning of the Fourth Amendment, and then that the seizure was unreasonable." Stamps v. Town of Framingham, 813 F.3d 27, 35 (1st Cir. 2016).  Seizure occurs for purposes of the Fourth Amendment "when a police officer has in some way restrained the liberty of the citizen through physical force or show of authority." United States v. Camacho, 661 F.3d 718, 725 (1st Cir. 2011) (internal quotation marks omitted). "Where an officer creates conditions that are highly likely to cause harm and unnecessarily so, and the risk so created actually, but accidentally, causes harm, the case is not removed from Fourth Amendment scrutiny." Stamps, 813 F.3d at 35.

    "Qualified immunity attaches when an official's conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." White v. Pauly, 137 S. Ct. 548, 551 (2017) (internal quotation marks

_____

    [3] Although he was not on duty at the time of the incident, Rogan does not challenge his status as a state actor for purposes of the claim under § 1983.

omitted).  "To avoid a qualified-immunity defense, [the
plaintiff] must show (1) that [the defendant] infracted his
federal rights and (2) that these rights were so clearly
established that a reasonable officer should have known how they
applied to the situation at hand." Belsito Comm'ns, Inc. v.
Decker, 845 F.3d 13, 23 (1st Cir. 2016).

To be clearly established, "existing precedent must have
placed the statutory or constitutional question beyond debate."
White, 137 S. Ct. at 551.  In addition, the precedent must be
"particularized to the facts of the case," that is a situation
where an officer was acting under similar circumstances and was
held to have violated the asserted constitutional right.  Id. at
552.  In the context of an officer's use of force, the court
must look at the specific circumstances the officer faced to
determine whether precedent existed that clearly established the
force used was excessive under the Fourth Amendment.  Mullenix
v. Luna, 136 S. Ct. 305, 309-10 (2015).

Excessive force must be assessed in light of all of the
circumstances, including the severity of the suspected crime and
whether the suspect is attempting to flee from the police.
Graham v. Connor, 490 U.S. 386, 397 (1989).  Whether or not a
police officer has identified himself to a suspect before a stop
or arrest is an important consideration in determining whether

8

the officer acted reasonably.  See, e.g., White, 137 S. Ct. at 552 (noting importance of police identification in investigatory activities); Ayers v. Harrison, 650 F. App'x 709, 712-16 (11th Cir. 2016); Pekrun v. Puente, 172 F. Supp. 3d 1039, 1044-45 (E.D. Wisc. 2016); Rawlings v. District of Columbia, 820 F. Supp. 2d 92, 110 (D.D.C. 2011) (discussing Hundley v. District of Columbia, 494 F.3d 1097 (D.C. Cir. 2007)); Scott v. City of Cleveland, 555 F. Supp. 2d 890, 898-99 (N.D. Ohio 2008); Williams v. City of New York, 2007 WL 2214390, at *10 (S.D.N.Y. July 26, 2007); Gomez v. City of New York, 2007 WL 5210469, at *6 (S.D.N.Y. May 28, 2007); Sutton v. Duguid, 2007 WL 1456222, at *8 (E.D.N.Y. May 16, 2007); Vasquez v. City of Jersey City, 2006 WL 1098171, at *6 (D.N.J. Mar. 31, 2006); Johnson v. Grob, 928 F. Supp. 889, 907 (W.D. Mo. 1996).

Material factual disputes preclude summary judgment in this case as to whether Rogan violated R.N. and P.N.'s Fourth Amendment rights and whether Rogan is entitled to qualified immunity.[4]  Although Rogan says he identified himself as a police officer before he chased P.N., P.N. says that Rogan did not identify himself until after the chase when P.N. was on the

---

[4] Rogan's argument that the scrapes that P.N. received when he fell are insufficient injuries to maintain an excessive force claim is without merit.  See, e.g., Bastien v. Goddard, 279 F.3d 10, 16 (1st Cir. 2002); Long v. Abbott, 2017 WL 829145, at *19-*22 (D. Me. Mar. 1, 2017).

ground.  The parties also dispute the nature of P.N.'s actions, including whether he was in the street, whether he was interfering with cars and traffic, and whether he was acting in an aggressive and threatening manner.  Rogan contends that he told R.N. to sit down next to P.N. "to control the situation due to R.N.'s height and build," but it is not clear from the record that Rogan had any need "to control the situation."

Therefore, Rogan's motion for summary judgment on R.N.'s civil rights claims, Count One, is denied.

B.  State Law Claims

R.N. brings state law claims of assault, battery, intentional and negligent infliction of emotional distress, and false arrest.  Rogan moves for summary judgment on the grounds that the state law claims are barred by sovereign immunity, official immunity, and immunity based on justification under RSA 507:8-d.  R.N. contends that the immunity theories do not apply here.

1.  Sovereign Immunity

Rogan combines the doctrines of sovereign and official immunity, arguing that both preclude his liability for the state law claims.  In support, Rogan contends that his actions are immune from liability under RSA 541-B:19, I(b), (c), and (d). Rogan acknowledges that sovereign immunity applies to the state

10

but asserts, without citation to authority, that sovereign immunity "no less provides a derivative protection to those employees whose actions are being scrutinized, through official immunity."

Rogan has not shown that sovereign immunity would provide protection to him in this case.  See Farrelly v. City of Concord, 168 N.H. 430, 443 (2015) (discussing immunity of municipalities from liability based on the actions of their officials).

### 2.  Official immunity

"Official immunity protects individual government officials or employees from personal liability for discretionary actions taken by them within the course of their employment or official duties." Everitt v. Gen. Elec. Co., 156 N.H. 202, 214 (2007); see also Farrelly, 168 N.H. at 439.  Police officers are protected by official immunity "for decisions, acts or omissions that are:  (1) made within the scope of their official duties while in the course of their employment; (2)discretionary, rather than ministerial; and (3) not made in a wanton or reckless manner."  Id. at 19.

The factual disputes about what happened in this case, however, preclude summary judgment based on official immunity.

11

3.   <u>Justification</u>

Rogan briefly mentions immunity from civil liability based on justification under RSA 507:8-d and RSA chapter 627.   The justification defense is not sufficiently developed to allow review.   In addition, the same disputed facts would preclude immunity based on justification for purposes of summary judgment.

## Conclusion

For the foregoing reasons, the defendant's motion for summary judgment (document no. 14) is denied.

Now that the motions for summary judgment have been resolved, it behooves the parties to direct their resources towards resolving this case before the parties and the court spend the considerable time and resources necessary to prepare for trial.   Although counsel previously reported that mediation was not appropriate, the court expects the parties to mediate before trial.   To that end, counsel shall carefully examine the claims and defenses in this case to evaluate their viability, the proof necessary to support them, and how they will present those matters to a jury.

Trial is scheduled for the period beginning on May 2, 2017, with the final pretrial conference to be held on April 13, 2017. The parties shall file a joint mediation statement **on or before**

**April 3, 2017,** in which the parties state whether mediation has been held or has been scheduled.

SO ORDERED.

Joseph DiClerico, Jr.
United States District Judge

March 8, 2017

cc:  Matthew T. Broadhead, Esq.
     Lawrence A. Vogelman, Esq.